117 P.2d 250

McCLENDON et al. v. DEAN.
No. 4601.

Supreme Court of New Mexico.
Sept. 18, 1941.

Hanna, Wilson & Brophy, of Albuquerque, for appellant.

Owen B. Marron, Dailey & Rogers, and Rodey, Dickason & Sloan, all of Albuquerque, for appellees.

BRICE, Chief Justice.

This action was brought by the Home Insurance Company, a corporation (plaintiff in the district court), under Ch. 8, N.M.L. 1933, to have determined conflicting claims to the proceeds of a $3,000 fire insurance policy payable to the defendants, William Walton and Ramona Walton. The trial court ordered the claimants to interplead in said action, and, upon hearing, a decree was entered apportioning the proceeds of the policy among certain of the claimants, after payment into court.

The appellant, William E. Dean, as trustee in bankruptcy of the estate of William Walton and Ramona Walton, intervened, claiming the proceeds of the policy, and upon decree being entered holding that he as trustee had no right, title or claim to the money, appealed to this court.

The trial court's findings of fact are substantially as follows:

In the month of August, 1939, the defendants, William Walton and Ramona

Walton, for a valuable consideration, constituted themselves trustees of policies of fire insurance and the proceeds thereof, procured for the benefit of all persons furnishing labor and materials in the erection of a certain dwelling house located, etc.

The dwelling house in question was erected by the defendants Walton and was destroyed by fire on the 7th day of November, 1939, and the monies involved represent the proceeds of fire insurance policies procured by said Waltons, of which they constituted themselves trustees, as heretofore found. That the following claimants each furnished labor and materials in the erection of said dwelling house, of the reasonable value set out after his name:

| | |
|---|---:|
| Paul McClendon | $ 320.00 |
| Edward Sackett | 265.00 |
| Superior Lumber Company | 1788.81 |
| J. Korber and Company | 60.85 |
| J. E. Sublett | 275.00 |
| J. C. Camp | 107.10 |
| J. C. Camp | 233.74 |
| J. C. Camp | 45.00 |
| J. C. Camp | 112.00 |
| W. C. Ellis | 66.10 |
| C. T. Rapp | 47.00 |
| Frank Jackson | 5.00 |
| C. R. Hoffman | 74.75 |

The trial court concluded that the insurance money which had been impounded in the court was a trust fund held by the court for the benefit of the claimants named, from the month of August, 1939;

and that the trustee in bankruptcy had no right, title, claim, or interest therein. Exception was taken to the findings of the court, as follows: "To all these findings and conclusions the trustee in bankruptcy * * * object and except."

The intervener, William E. Dean, alleged in his plea of intervention, in substance, that the defendants Walton were adjudged bankrupts by a United States district court of the state of California on the 22nd day of March, 1940, in which proceeding he was appointed trustee of their estates; that the net proceeds of the insurance policy in the hands of the clerk of the district court of Bernalillo County was $2911.20, and " * * * that under the terms of the National Bankruptcy Act [11 U.S.C.A. § 1 et seq.] said proceeds now in the hands of the Clerk should be released and transferred to the jurisdiction of the bankruptcy court in California and to the trustee in said causes now pending in the United States District Court, for the Northern District of California, Nos. 32612-S and 32611-W."

He prayed that the clerk of the district court be ordered to transfer said funds "to the jurisdiction of the bankruptcy court of California, and to him, the trustee therein duly appointed and acting."

From the allegations of the pleading it would appear that its sole purpose was to question the jurisdiction of the state district court. But the intervener contested on the merits the right of claimants to any interest in the property, and invited the

action of this court on the question of title. If a trust was established, as the trial court held, it occurred more than four months before the Waltons were adjudged to be bankrupts by the bankruptcy court in California. There was no lien foreclosure involved in this suit. The question was one of title to the funds impounded in the district court.

We need not cite authority to the effect that the district courts of this state are courts of general jurisdiction, and have jurisdiction to try and adjudicate the title to personal and real property. Unless the Congress, the supreme authority over bankrupt estates, has deprived these courts of jurisdiction to determine the questions involved, then the trial court was correct in holding that it had jurisdiction of the subject matter of this suit.

There is no contention that the claims to the impounded funds are fictitious or merely colorable. Indeed, it does not appear that the Waltons ever claimed any interest in them, or ever had possession or claimed the right to their possession. They are not subject to summary orders of the bankruptcy court, but title can only be adjudicated in a plenary suit, such as the suit filed below. Steelman v. All Continent Corp., 301 U.S. 278, 57 S.Ct. 705, 81 L.Ed. 1085; In re Williams, 8 Cir., 53 F.2d 486.

When a petition in bankruptcy is filed, all property in the actual or constructive possession of the bankrupt of which he claims ownership, is vested in the bankruptcy court, with exclusive jurisdiction over controversies relating thereto, regardless of location. Ex parte Baldwin and Thompson, Trustees, 291 U.S. 610, 54 S.Ct. 551, 78 L.Ed. 1020. But even in such cases the state courts are not without jurisdiction of the subject matter in the sense the question has been raised here. In such cases a state court could not exercise jurisdiction in opposition to the will of the bankruptcy court; or at least it could with that court's consent. Thompson v. Magnolia Pet. Corp., 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876; Taylor v. Sternberg, 293 U.S. 470, 55 S.Ct. 260, 79 L. Ed. 599. But the jurisdiction of bankruptcy courts is controlled by Congress, and jurisdiction of state courts in suits between trustees and adverse claimants, under certain conditions, is specifically recognized by the bankruptcy act; and the decisions of the federal courts. Schumacher v. Beeler, 293 U.S. 367, 55 S.Ct. 230, 79 L.Ed. 433.

The bankrupts never at any time had possession, actual or constructive, of the funds in suit, and so far as the record discloses, never claimed them or any interest in them. The suit was instituted and the funds impounded for title adjudication, before the petitions in bankruptcy were filed; and so far as the record discloses, the intervener is acting upon his own initiative, and not by order of the bankruptcy court. Under such conditions there can be no doubt of the state court's jurisdiction, and its right and duty to adjudicate the title to the impounded funds. Her-

man v. Cullerton, 9 Cir., 13 F.2d 754; In re InterOcean Transportation Co., D. C., 232 F. 408; Bryan v. Speakman, 5 Cir., 53 F.2d 463; Connell v. Walker, 291 U.S. 1, 54 S.Ct. 257, 78 L.Ed. 613; In re American Fidelity Corp., D.C., 28 F. Supp. 462.

The state court had jurisdiction of the subject matter of the suit, and the intervener is bound by an adjudication of title to the property in suit to which he was a party claiming ownership under the facts of the case.

The remaining question is whether the trial court erred in holding that the funds in suit were trust funds for the benefit of claimants.

The evidence upon which the court found and concluded that the funds were trust funds, was conversations between W. D. Walton and the contractor and laborers who were building the house that was subsequently destroyed by fire. If there was a trust, it must be predicated on this testimony.

James Edward Sublett testified: I am a contractor and built the Walton house, which was destroyed by fire. I had an agreement with W. D. Walton regarding insurance on the house. I told Walton that I intended to take out $1,000 insurance the next day, for the benefit of my men, and Walton told me it was not worth while to do that, that he was going to insure the house and that the insurance would cover it all, labor and all, until he got his money; that I would not have to take out insurance. That the insurance would be for my benefit and for the benefit of the laborers and contractor, and so on. I had always taken out insurance on buildings I was constructing.

James Sublett testified: I worked for my father, James E. Sublett, on the Walton house. A few days after we began work I told Walton I was going to quit because he had no insurance. Walton told me that he would take out insurance "for the purpose of labor and materials." He told us to go ahead and build the house and he would take care of the insurance, and at the time we finished the house our money would be ready for us. He was expecting to get a loan, but in case of the house burning the insurance money would be used to pay the laborers. I knew he took out the insurance.

C. R. Hoffman worked on the Walton house. When he had finished his part, which was making the foundation, he did not get his money. Walton told him that he was going to "make a loan." He told of the conversation between Mr. Sublett and Walton, in which Walton said he was going to take out insurance to "cover the whole thing, labor, material and all."

There was other corroborative testimony, which adds nothing to the facts.

The substance and effect of this testimony is that Walton said he would take out fire insurance to protect those who furnished labor and material for the building. The promise was brought about by Sublett's statement that he would take

out insurance to protect his men. Walton replied, "There ain't no use; I am going to take out insurance to cover the whole thing, labor material and all." He soon thereafter procured insurance and Sublett and others, acting on his promise, continued work and did not insure for their own protection. It is a legitimate inference that the insurance was procured for the benefit and protection of the laborers, material men and all others aiding in the construction of the building, and the trial court so found.

It is asserted that as the policy of insurance was not assignable by its terms, that claimants could have no interest in it. But this provision in the policy was for the benefit of the insurance company, and it has not contested the payment of the policy on that or any other ground. It has conceded its liability, and has paid the fund into court. As between Sublett and claimants the assignment was valid. 1 Restatement of the Law of Contracts, § 176; Williston on Contracts, Rev.Ed., § 422; 1 Scott on Trusts, § 80.

It is asserted that at the time the court found that the Waltons declared themselves trustees of the policy it was not in existence; and that a trust of nothing but a promise cannot exist. The testimony was admissible to prove the intention of Walton in taking out the policy. If the policy was secured for the benefit of claimants, it was in existence at that time. If the court was in error as to the date the trust came into existence, it is immaterial if in fact a trust was created at all. If the spoken words can be reasonably construed to effect a trust intent the conclusion of the trial court that such was the intent with which the fire insurance policy was secured, should not be disturbed by this court.

"In the creation of trusts settlors have never been handicapped by formalism. They have not been required to express their intention to create a trust in set phrases or words. The courts of equity have sought to find the real meaning of language used by settlors and have construed it to indicate a trust intent if the legal incidents of a trust were desired, no matter how clumsy or unsuitable the phrases used.

"Thus, in some cases where the language, from its surface appearance, has indicated an absolute gift, or an assignment of a chose in action, or a condition subsequent, or a contract, or an executorship, agency, guardianship, or partnership, the courts have looked searchingly into the transaction and found the real intention to have been that of a settlor of a trust. And, contrariwise, the use of words of trusteeship has often failed to establish a trust, where the deep underlying intent has appeared to indicate a desire for another relationship." 1 Bogert on Trusts and Trustees, § 45.

The mere manifestation to create a trust inter vivos at some future time does not create a trust, particularly of property owned at that time by the declarant. But such a manifestation regarding property not then owned by the declarant, con-

sidered in connection with the purchase of such property immediately thereafter (within the evidence here, the next day after the agreement to purchase) and his failure to personally claim the property as his own, are facts from which the court may infer the intention to create a trust at the time the property was purchased.

"A manifestation of intention to create a trust inter vivos at some time subsequent to the time of the manifestation does not create a trust." Restatement of Law of Trusts, § 26.

"If a person manifests an intention to become trustee at a subsequent time, his conduct at that subsequent time considered in connection with his original manifestation may be a sufficient manifestation of intention at that subsequent time to create a trust. Thus, if a person executes a declaration of trust of certain property not at the time owned by him and he thereafter purchases property of that description, the act of acquiring the property coupled with the earlier declaration of trust may be a sufficient manifestation of an intention to create a trust at the time of the acquisition of the property." Restatement of Law of Trusts. § 26k.

"If a person manifests an intention to become trustee at a subsequent time, his silence at that time considered in connection with his original manifestation may be a sufficient manifestation of intention at that time to create a trust. Mere silence, however, ordinarily will not be such a manifestation. Whether silence is or is not such a manifestation is a question of interpretation." Restatement of the Law of Trusts, § 26-L.

Other principles support the judgment.

It was the view of the trial court that the promises of Walton to take out insurance for the benefit of all persons furnishing labor and materials in the erection of Walton's house were made upon a valuable consideration. The view is well supported that if a person receives consideration for his promise to create a trust, he may incur a liability upon the promise if he fails to perform it, and a court of equity may specifically enforce it. Scott on Trusts, § 26.3.

Although a promise to create a trust in the future does not create a present trust, a present trust may be created of the rights of a promisee under a contract. Scott on Trusts, § 26.4.

Where a person purports to create a present trust of property to be acquired in the future, the transaction may be considered as in effect a promise to create a trust when the property is acquired. If, indeed, there is a binding promise to transfer after-acquired property to another as trustee, a trust may be immediately created, not of the after-acquired property but of the rights arising out of the contract; that is to say, the trustee may immediately become trustee of the rights created in him by the promise. Scott on Trusts, § 86. The text continues:

"If consideration was received by the settlor it is clear that at least there is a

valid contract for breach of which he would be liable if he refused to perform his promise. It would seem also that ordinarily at least the remedy at law is not adequate, and he could be compelled in equity specifically to perform his promise. * * * In England, it is true, it is held that the beneficiary of a contract cannot enforce it, and to avoid the application of this unfortunate rule the English courts take the view that a trust automatically arises as soon as the property is acquired."

In 9 Encyc. of Evidence at page 912, it is said: "Generally speaking, a particular status or relation once shown is presumed to continue, at least as long as it would naturally in the ordinary course of events."

In 7 Encyc. of Evidence at page 591, it it said: "It has been held that where an intent is shown to have once existed, it is presumed to continue until the contrary is established by evidence either direct or presumptive."

The record discloses that Walton, upon consideration, promised to take out insurance for the benefit of the workmen and materialmen who were making claims against him and his property. The next day he took out such insurance. It is a fair inference in the absence of evidence to the contrary that the taking out of the insurance so soon after the promises made, manifests the intention on the part of Walton that it was for the purpose promised.

It is asserted that as the insurance policy was made payable to the Waltons, that under Section 68-401 N.M. Sts. 1929, the presumption is that the interest of the wife was her separate property, and there is no evidence that she joined in the creation of a trust.

The section of the statute cited provides that whenever any property is conveyed to a married woman by an instrument in writing the presumption is that title is thereby vested in her as her separate property. This statute has reference to the conveyance of real estate. It was adopted from the State of California, and that was the conclusion of the appellate court of that state in McAlvay v. Consumers Salt Co., 112 Cal.App. 383, 297 P. 135. There is no presumption that personal property acquired during coverture and held in the name of the wife, is her separate property. Under Section 68-403 N.M.Sts.1929, it is provided that the husband has the management and control of the personal property of the community, and during coverture he has the sole power of its disposition, except as to the conveyance or mortgaging of real estate; in which the wife must join. Also see Stafford v. Martinoni, 192 Cal. 724, 221 P. 919.

Walton was authorized as manager of the community property of himself and wife to create a trust with which to pay the community debts.

The decree of the district court should be affirmed, and it is so ordered.

ZINN, SADLER, MABRY, and BICKLEY, JJ., concur.